UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:12-cv-10440-GAO

|                                        | ) |
|----------------------------------------|---|
| ANNE M. OULTON,                        | ) |
|                                        | ) |
| Plaintiff,                             | ) |
|                                        | ) |
| v.                                     | ) |
|                                        | ) |
| BRIGHAM AND WOMENS HOSPITAL, INC.,     | ) |
|                                        | ) |
| Defendants.                            | ) |

**PLAINTIFF'S MOTION FOR RELIEF
FROM JUDGMENT OF DISMISSAL OF COUNTS I and IV**

In accordance with Fed. R. Civ. P. 59(e), Plaintiff seeks to alter or amend the judgment of dismissal of Count I alleging gender discrimination and Count IV alleging retaliation under the Massachusetts Healthcare Whistleblower Act and reinstate both counts. As grounds therefore, the Plaintiff contends that the Court's March 29, 2013 Order and Opinion reflects an analysis not in keeping with First Circuit precedents for motions to dismiss. The First Circuit has recently addressed the motion to dismiss standard and that decision strongly suggests that the motion to dismiss was improperly granted. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49 (1st Cir. 2013).

**I. THE COMPLAINT ALLEGES FACTS SUFFICIENT TO SURVIVE A MOTION TO DISMISS AS TO COUNTS I AND IV**

**A. The Gender Discrimination Claim**

The Complaint alleges the following facts that are relevant to this motion:

Most of the cardiac perfusionists at Brigham and Women's Hospital (BWH) did not want to work on intra-operative hyperthermic chemotherapy ("IOHC" or

1

"chemotherapy") cases, and while pregnant with her third child in 2009, Plaintiff told her supervisor she did not want to be exposed to toxic chemotherapy drugs used in the IOHC cases. ¶¶14-16. Her supervisor, who previously commented in the presence of an obviously pregnant Plaintiff, that people "should only have one child," nonetheless assigned her to a chemotherapy case in November 2009. ¶¶10-11. Plaintiff was able to switch with another colleague (who was not pregnant) and did not work in a chemotherapy case while she was pregnant.

On March 2, 2010, Plaintiff returned to work after her maternity leave and informed her supervisor that she was breast feeding her infant daughter. ¶¶25-26. On March 3, Plaintiff learned that her supervisor had chosen her to be "trained" in the chemotherapy cases. There were ten other perfusionists on staff at the time. 10. As such, the only perfusionist who had been pregnant in 2009, who had taken maternity leave in 2010, and who was breast feeding in 2010, was chosen by the supervisor to be trained.

The training was described as working on three IOHC cases with another perfusionist, Mr. Bill Reilly. ¶41. Plaintiff expressed concerns about whether it was safe for breast feeding staff to be in the chemotherapy cases, and spoke with two other BWH supervisors, but she remained staffed on, and worked in, the chemotherapy case on March 3, 2010. ¶¶29-36. Plaintiff's supervisor assigned her to two additional chemotherapy cases on March 8, 2010. ¶45. By the end of the day on March 8, 2010, Plaintiff had already been in three chemotherapy cases, and had therefore completed the training. *Id*.

On March 12, 2010, the supervisor asked every perfusionist to respond "yes or no" if they wanted to work in the chemotherapy cases. Plaintiff immediately responded, "No" as did her male colleague, Mike McAdams. ¶46. Even though Plaintiff had already been trained and completed three cases, her supervisor did not assign another perfusionist to be trained on the next chemotherapy cases. Instead, the supervisor assigned the Plaintiff, despite her "no" response on March 12th, to the next chemotherapy case on March 15, 2010. ¶47. There were nine other perfusionists available to work on chemotherapy cases - but none of them were assigned to the March 24th chemotherapy case. ¶¶50-51. The supervisor assigned Plaintiff to work in the March 24th chemotherapy case. ¶50. No perfusionist - other than Plaintiff - was "trained" in chemotherapy cases at BWH in March. ¶51.

Another perfusionist, Mike McAdams, expressed concerns about being in chemotherapy cases because he and his wife were trying to conceive. Though Plaintiff had concerns about possible exposure to her and her infant daughter, she was assigned to the chemotherapy cases. McAdams was not. Though Plaintiff and McAdams both said "no" when asked if they wanted to work in the chemotherapy cases, the supervisor put the female perfusionist, who had already been trained, into two more cases. ¶¶ 46-49.

2

On April 25, 2010, Plaintiff confronted her supervisor because she learned that he told other members of the department that he was keeping her out of the chemotherapy cases for safety reasons. Her supervisor admitted that Plaintiff "never should have been in the IOHC cases; he had checked the National Institute for Occupational Health and Safety (NIOSH) website and it said there is a risk for breastfeeding mothers." ¶¶53-54. Plaintiff expressed her anger, in very strong terms, that her supervisor had put her into the chemotherapy cases despite her concerns.

Two days later, on April 27, her supervisor instructed Plaintiff to call a BWH physician who did robotic surgery and wanted a perfusionist to be trained in Atlanta. ¶58. On April 28 her supervisor told her she was going to Atlanta, and when she repeatedly demurred and finally said she couldn't travel while she was breast feeding, he said she was going since they have refrigerators in Atlanta. ¶59. The same day, her colleagues asked her why the supervisor had "singled her out" in an email about vacation requests. ¶¶62-64.

On April 30th, her supervisor exhibited hostility toward Plaintiff in the employee lounge, then followed her to the operating room and began screaming at her, repeatedly demanding that she "not leave the operating room," scaring and humiliating her in front of other staff. Her supervisor later returned to the operating room and caused another scene – in the midst of a patient's procedure – because Plaintiff had taken a bathroom break. Later that same day, her colleagues told her she couldn't work at BWH anymore since her supervisor was so hostile. She reported to Human Resources that she was being retaliated against for speaking up about the IOHC cases. ¶¶72, 78. In May, BWH's Director of Occupational Health Services and Chief of Occupational and Environmental Medicine said Plaintiff never should have been in the IOHC cases while she was breast feeding. ¶82. Her last day of work at BWH was May 14, 2010. ¶83.

These facts establish that Plaintiff was treated differently from all of the other perfusionists who worked at BWH in March – May 2010 – and she contends that the reason she was treated differently was because she was the only perfusionist who had been pregnant in 2009, who had taken maternity leave in 2010, and who was breast feeding in 2010. At the risk of stating the obvious, pregnancy, maternity leave and breast feeding are gender-based.

### B. The Healthcare Whistleblower Claim

The Complaint alleges that Plaintiff disclosed that the Perfusion Department had a practice or policy to assign pregnant and/or breastfeeding staff to IOHC cases. She disclosed this

3

practice to: 1) BWH's Chief of Occupational and Environmental Medicine; 2) BWH's Director of Environmental Affairs; 3) Allison Bogosian in Human Resources; and 4) BWH's Director of Occupational Health Services (Joanna Krasinski). Plaintiff reasonably believed the practice of requiring staff with reproductive or gestational concerns to work in IOHC cases violated professional standards because of the health risks posed by exposure to toxic drugs.

It was Plaintiff who first notified BWH's Director of Environmental Affairs and the Director of Occupational Health Services that: 1) no environmental testing had been done in the building where the IOHC cases were being performed in 2010; 2) higher dosages of chemotherapy drugs used in 2010 had not been tested; 3) nor had the combination of two chemotherapy drugs into a single solution, as administered in 2010 IOHC cases, been tested; and 4) the IOHC cases performed in 2010 used a new piece of equipment to make the chemotherapy solution super-oxygenated. In short, Plaintiff disclosed to all of the people whose job it was to protect staff and patients from airborne exposure to chemotherapy drugs that the thoracic surgeons were performing experimental procedures using toxic chemicals and equipment that BWH hadn't evaluated or tested in years. Indeed, the Complaint alleges that BWH did not do environmental testing in the operating rooms where the IOHC cases were being done until August 2010 – three months <u>after</u> Plaintiff blew the whistle.

## II. THE STANDARD ENUNCIATED BY THE FIRST CIRCUIT MANDATES REINSTATEMENT OF COUNTS I AND IV

In order to survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012) (reversing dismissal of complaint of political discrimination). A court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. *Ocasio-Hernandez v. Furtuno-Burset*, 640 F.3d 1 (1st Cir. 2011).

Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw. *Id*. at 13. When rendering that determination, a court may not look beyond the facts alleged in the complaint. *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

In deciding motion to dismiss, the court must accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor. *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006). The relevant question for a district court in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether "the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

Where motive or intent is at issue, "telltale clues may be gathered from the circumstances surrounding the adverse employment action. The plausibility threshold simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct." *Ocasio-Hernandez*, 640 F.3d at 17 (*quoting Twombly*, 550 U.S. at 556). Close temporal proximity between the alleged unlawful conduct and an adverse employment action, "coupled with the absence of any legitimate reason for much of the offending conduct, permits a plausible inference at the pleading stage that [an illegal] animus was a motivating factor behind the harassment." *Grajales*, 682 F.3d at 50.

The recent case of *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49 (1st Cir. 2013), is particularly instructive. The plaintiff alleged political discrimination, and the district court

5

granted a motion to dismiss that claim, finding the complaint failed adequately to establish that the new head of the agency where plaintiffs worked was aware of their affiliations with opposing political parties. The First Circuit found that the district court subjected the complaint to an overly stringent pleading standard. "An assertion that a defendant was affirmatively seeking information about employees' political affiliations is more than a bare legal conclusion. The plaintiffs' 'witch-hunt' and 'talk[ing] about politics' averments, though general, are factual assertions that must, at the pleading stage, be given credence." *Id*. at __, 2013 U.S. App. LEXIS 5803 at \*12-13 (citing *Ocasio-Hernández*, 640 F.3d at 15 (holding similar allegations to be factual, not conclusory)).

The First Circuit also rejected the district court's finding that the plaintiffs failed to plausibly allege a defendant's antagonistic political affiliation. "The complaint does state, however, that the '[p]laintiffs belong to political parties that espouse philosophies and ideas different to those of the defendants'(including Ríos) and characterizes Ríos as a high-ranking official in the revamped (New Progressive Party-appointed) AIJ administration. A high degree of factual specificity is not required at the pleading stage . . . Thus, to survive a Rule 12(b)(6) motion, it is not necessary for a plaintiff in a political discrimination case to bring forth evidence that the defendant is a card-carrying member of the opposition party. On this issue, the plaintiffs' factual allegations are adequate for pleading purposes." *Id*. at \*\*14-15 (citation omitted).

Finally, the First Circuit also found fault with the district court's finding that the complaint lacked any plausible allegation that political affiliation was a substantial or motivating factor behind the adverse employment actions:

> Once again, it is important to bear in mind that the plaintiffs, for pleading purposes, need not establish this element; the facts contained in the complaint need only show that the claim of causation is plausible. Direct evidence of political animus is not a *sine qua non*. . . . In this instance, the plaintiffs'

6

complaint noted that "[o]nce the new administration arrived, its officers . . . made expressions as to the fact that there would be NPP's very upset if [the plaintiffs'] contracts would be renewed." This allegation forms a part of the plausible basis for a finding as to the cause of the ensuing adverse employment actions. In an environment in which leaders of the AIJ were voicing a need to shed non policymaking employees who did not share their particular political persuasion, it surely is plausible that the plaintiffs' political affiliations became a substantial or motivating factor behind their loss of employment.

*Id*. at \*\*16-17. *See also Davenport v. Natgun Corp*., 2013 U.S. Dist. LEXIS 32291, 7-8 (D. Mass. Mar. 7, 2013) (denying motion to dismiss claim of disability discrimination). In *Davenport*, Judge Gorton found that the plaintiff alleged that his employer was aggravated about his broken ankle since it was the second time he had been injured that year, and as a result, the employer regarded him as "damaged goods" and fired him. The court then drew all reasonable inferences in favor of the plaintiff, finding that the allegations permitted the inference that his employer was of the view that his ankle had not and would not fully heal, which, taken in light of his positive performance evaluations and the refusal to hire him for light duty work, plausibly suggested that employer regarded him as disabled under the ADA.

### A. The Gender Discrimination Claim Was Improperly Dismissed Under This Standard

It appears that this Court "tested the complaint in a crucible hotter than the plausibility standard demands" and should therefore reconsider its decision. *Rodriguez-Reyes,* 2013 U.S. App. LEXIS 5803 at \*7. The Court dismissed Plaintiff's gender discrimination claim on the following grounds:

> Plaintiff fails to plead sufficient facts to support the position that she was treated differently from non-pregnant employees, as all the perfusionists were expected to participate in IOHC procedures and training and to be on-call at various times. Instead, her position is that she should have been excused from such responsibilities and thereby treated differently from other employees. The single factual allegation to demonstrate disparate treatment, that a male colleague was excused from IOHC cases while the plaintiff was not, is not enough to allow a "reasonable inference that the defendant is liable" under this theory of recovery.

7

The Court's analysis ignores all but one of the facts in the Complaint that were restated on pages 1-3, above. As such, the Court did not accept all the facts in the complaint as true. Nor did the Court draw any reasonable inferences in favor of the Plaintiff. It did the opposite – and drew adverse inferences against the Plaintiff. Finally, the Court's dismissal is anchored on facts not alleged the Complaint. Nowhere in the Complaint does plaintiff allege that "all perfusionists were expected" to participate in IOHC cases and to be trained in them. Nowhere in the Complaint does Plaintiff allege that "she should have been excused from" being on-call. Plaintiff alleges, however, that her supervisor discriminated against because of her gender by assigning her much more on-call responsibilities in 2010 than she had before she went on maternity leave in 2009, and by assigning her to a four-day work week in March 2010, in contrast to the three-day work week she had before she went on maternity leave in 2009.

The March 29, 2013 Order and Opinion does not reflect conformance with the standards applicable to a 12(b)(6) motion. The Court's opinion makes no reference to the litany of facts highlighted above which, if deemed true as required, and if from which all reasonable inferences were drawn as required, adequately establish a plausible cause of action for gender discrimination. As such, the Court should reconsider its ruling and deny the motion to dismiss Count I. *See Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st. Cir 2000) (vacating dismissal of sex discrimination claim where allegations that male customer who wore women's clothing to bank was sent home to change into men's clothes in order to receive loan application could support claim of discrimination on basis of sex if bank's conduct was based on conformance with traditional gender stereotypes); *Notter v. North Hand Protection*, 89 F.3d 829 (4th Cir. 1996) (noting employer's reaction to pregnancy can be circumstantial evidence of

pretext and intent to discriminate where supervisor evidenced disapproval or negative view of employee and her pregnancy).

To state a claim of discrimination, a plaintiff must allege four elements: 1) that she is a member of a protected class; 2) that she suffered an adverse employment action; 3) that there was discriminatory animus; and 4) that the discriminatory animus caused the adverse employment action. *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502 (2001). *See also Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 167, (1978) (holding "any classification that relies on pregnancy as the determinative criterion is a distinction based on" gender).

To have a plausible differential treatment claim, a plaintiff must allege that she was treated differently from similarly situated males, *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 38 (1st Cir. 2001), and that gender was the reason for that difference, *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999). "One method [of proving discrimination] is to produce evidence that the plaintiff was treated differently than other similarly situated employees." *Ugurhan Akturk Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003). A finding of disparate treatment of a similarly situated male supports a finding of discriminatory intent on the part of the decision maker in connection with the adverse employment action experienced by a female. A plausible claim requires only a single similarly situated counterpart. *See Caesar v. Shinseki*, 887 F. Supp. 2d 289 (D. Mass. 2012) (granting summary judgment on gender claim after finding the only identified male counterpart was not "similarly situated" to plaintiff).

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To state a claim for constructive discharge, a plaintiff must allege that the employer imposed "working conditions so

9

intolerable that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities." *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000). *See also Fisher v. Town of Orange*, CA. No. 10-30172-FDS (D. Mass. Feb. 24, 2012) (denying motion to dismiss hostile work environment claim where allegations supported plausible inference Fire Chief knew or should have known of misconduct and failed to act).

Plaintiff has alleged that her supervisor was motivated by a discriminatory animus based on her gender, and that animus was a motivating factor in: assigning her to work more days than she had before her pregnancy and maternity leave; by arranging the call schedule so that she was on-call significantly more than she had been before she was pregnant and had taken maternity leave; by assigning her as the first, and only, perfusionist to go through a three procedure training protocol immediately upon her return from maternity leave; by assigning her to chemotherapy cases despite her safety concerns, while not assigning a similarly situated male perfusionist, who also expressed safety concerns about the cases and expressed his desire to not work them; by targeting her for another assignment for training that would require overnight travel out of state; by singling her out for negative and hostile treatment and humiliation – all within a short period of time – March 3, 2010 – April 30, 2010 – when her supervisor's outbursts and threatening manner and creation of a hostile work environment compelled her to resign. These facts state a claim to relief under Title VII and M.G.L.c. 151B that is plausible on its face.[1]

---

[1] If the Plaintiff is allowed to proceed with her gender discrimination claim, she can establish that the facts relied upon by the Court (which were not alleged in the Complaint) are incorrect. In proceedings at the Massachusetts Commission Against Discrimination (MCAD) in 2011, the MCAD investigator asked BWH to produce records showing which perfusionists worked on chemotherapy cases. Of the many perfusionists who worked at BWH in 2009, Brett Kinard did almost all of the chemotherapy cases, Amy Patel worked in two cases (when she was not pregnant or breast feeding) and Mr. McAdams did one case on May 19, 2009. Mr. McAdams did not work in any IOHC cases in 2010. These facts contradict the Court's finding that "all the perfusionists were expected to participate in IOHC procedures." BWH's records also show that a number of perfusionists had never worked in an IOHC case in the entire time they worked at BWH. This fact also contradicts the Court's finding that "all the perfusionists were expected to participate in IOHC procedures." In the MCAD proceedings, BWH admitted that none of the other perfusionists who worked with Plaintiff went through the three-case training protocol in 2010. The

10

**B. The Health Care Whistleblower Claim Was Improperly Dismissed**

The Health Care Whistleblower Act, M.G.L. ch. 149, § 187(b), provides that "a health care facility shall not . . . take any retaliatory action against a health care provider because the health care provider . . .

>   (1) discloses or threatens to disclose to a manager . . . an activity, policy or practice of the health care facility . . . that the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health . . .
>
>   (3) objects to or refuses to participate in any activity, policy or practice of the health care facility . . . which the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health.

The Court found that Plaintiff failed to state a claim because "the statute . . . is designed to safeguard patient care," citing *Commodore v. Genesis Health Ventures, Inc.*, 63 Mass. App. Ct. 57, 66 (2005). Plaintiff protested BWH's policy of assigning pregnant and breastfeeding employees to IOHC cases, and its failure to update environmental testing on those procedures despite the fact that the location, equipment and dosages used in the procedures all changed. The Court found those complaints did not relate to "patient care" and therefore Plaintiff's protests and objections are not protected activity under the statute.

In *Commodore*, however, the court's holding had nothing to do with "patient care." Instead, the court interpreted the definition of "health care facility." The *Commodore* court reversed the entry of summary judgment against a black employee who claimed race discrimination and retaliation under the whistleblower statute, finding that the focus of Mass.

---

MCAD investigator asked BWH to identify the perfusionists trained by Mr. Bill Reilly. BWH answered "Anne Oulton, Stacia Woldorf and Trevor Smith." Ms. Woldorf and Mr. Smith were not hired by BWH until the summer of 2010, after Plaintiff was constructively discharged in May, 2010. As such, Ms. Woldorf and Mr. Smith were not among the nine BWH perfusionists on staff with Plaintiff in March – May 2010, when the Court found that "all perfusionists were expected to be trained."

11

Gen. Laws ch. 149, § 187 is broader than the determination of employer status. *Commodore* stands for the proposition that a "health care facility" includes the facility's licensee and the facility cannot contract away its obligations to direct personnel and establish of policies, practices, and procedures at the facility.

The Court's Opinion and Order contains no statutory analysis. *Cf. Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1, 4 (1st Cir. 1998) (reversing dismissal of interference claim under FMLA based on statutory construction of word "employees" and finding that context of statute and regulations did not limit protection to "current employees"). The plain meaning of a statute's text must be given effect "unless it would produce an absurd result or one manifestly at odds with the statute's intended effect." *Parisi by Cooney v. Chater*, 69 F.3d 614, 617 (1st Cir. 1995). Statutory construction is a straightforward analysis, requiring the court "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Duckworth,* 152 F.3d. at 5 (internal citation and quotations omitted).

The Healthcare Whistleblower Act protects health care providers, such as Plaintiff, from retaliation on the part of a health care facility, such as BWH, where Plaintiff objects "to an activity, policy or practice that the health care provider reasonably believes is in . . . violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health." (emphasis supplied). The statute does not define "public health."

> Webster's International Dictionary defines public health as the:
>
> Science and art of preventing disease, prolonging life, and promoting health through organized community efforts. These include sanitation, control of contagious infections, hygiene education, early diagnosis and preventive treatment, and adequate living standards. It requires understanding not only of

12

epidemiology, nutrition, and antiseptic practices but also of social science. Historical public health measures included quarantine of leprosy victims in the Middle Ages and efforts to improve sanitation following the 14th-century plague epidemics. In the U.S., public health is studied and coordinated on a national level by the Centers for Disease Control and Prevention.

Patient health, patient safety and "patient care" are certainly subsumed in the definition of "public health." Plaintiff does not dispute that the Massachusetts legislature intended the statute to empower health care providers to object to practices that put patients at risk. But the legislature did not choose to limit the protections of the statute to only situations in which health care providers object to a practice reasonably believed to pose a risk to "patient care." Instead, the legislature chose a much broader phrase: public health. Protecting health care providers from risk of harm and exposure to toxic chemicals is a "public health" practice. Indeed, BWH follows this public health practice by requiring all personnel who are not necessary for the administration of chemotherapy drugs to leave the operating room when the chemotherapy bath is started. BWH follows this public health practice by allowing thoracic nurses who are pregnant or breast feeding to opt out of the IOHC procedures. BWH has an entire environmental services department as part of its public health effort– to protect patients, visitors and staff from harm when they are inside the hospital.

The Complaint alleges that in April 2010, after having already assigned her to five IOHC cases, her supervisor told Plaintiff that he had looked at the National Institute for Occupational Safety and Health (NIOSH) website and saw that there could be a risk of exposure to breast feeding women in IOHC cases, and that she never should have been assigned to them. NIOSH is the federal agency responsible for conducting research and making recommendations for the prevention of work-related injury and illness, and is part of the Centers for Disease Control, the entity that is responsible for "public health" efforts in the United States. NIOSH advises

American companies and institutions on "professional standards of practice" in the workplace and in particular, the standard of practice that BWH violated, and of which Plaintiff complained.

As the Healthcare Whistleblower Act is a remedial statute, it should be interpreted broadly – in the same manner that other whistleblower acts have been interpreted. *See Bolduc v. Town of Webster*, 629 F.Supp.2d 132 (D. Mass. 2009) (finding plaintiff's conduct to expose "racist practices by a police officer, or the condonation of such practices by a supervisor, would constitute an "activity, policy, or practice" that plaintiff could reasonably believe posed "a risk to public safety" and denying employer's motion for summary judgment under §185(b)(2)); *Simas v. First Citizens' Federal Credit Union,* 170 F.3d 37 (1st Cir. 1998) (vacating entry of summary judgment of whistleblowing and retaliation complaint under Federal Credit Union Act, noting plaintiff alleged constructive discharge in addition to alleging retaliation resulting in humiliation and ongoing emotional distress damages).

Because Plaintiff states a claim under the Healthcare Whistleblower Act based on her objection to BWH's policy, and its past practice, of assigning pregnant and breast feeding staff to IOHC cases and not doing environmental testing of those procedures for a number of years, Count IV should not have been dismissed. It is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). In contrast, the Court's decision is based on narrow interpretation of the statute by a focus on "patient care" rather than "public health."

The Massachusetts legislature did not limit the statute to "patient care" or "patient safety" and this Court is not empowered to re-write the statute or read different words into it. Where the plain language of the statute is unambiguous, "the sole function of the courts is to enforce the statute according to its terms." <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917). *See also*

*Brennan v. Election Comm'rs of Boston*, 310 Mass. 784 , 789 (1942) (court will "construe the statutes as they are written").  The legislature chose to protect those who object to practices that pose a risk to public health; the Court should reconsider its decision and deny BWH's motion to dismiss Count IV in order to give the remedial statute the broad interpretation intended by the legislature.

## III. CONCLUSION

Plaintiff respectfully requests that this Court reconsider its decision to dismiss Counts I and IV and reinstate them.

Respectfully submitted,
**ANNE M. OULTON,**
By her attorneys,

/s/ *Margaret M. Pinkham*
Margaret M. Pinkham (BBO#561920)
Elise Busny (BBO#600320)
PINKHAM BUSNY LLP
42 Pleasant Street
Woburn, MA 01801
Tel. 781-933-9840
mpinkham@pinkhambusny.com
ebusny@pinkhambusny.com

Dated:  April 26, 2012

## RULE 7.1 CERTIFICATION

I, Margaret M. Pinkham, certify that I attempted to narrow the issues raised in this motion by conferring with Defendant's counsel, but we were unable to do so.

/s Margaret M. Pinkham
Margaret M. Pinkham

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was forwarded via the Court's electronic filing system to counsel of record, this 26th day of April 2013.

/s Margaret M. Pinkham
Margaret M. Pinkham